*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

KATELYN ZWIKER, Individually and on Behalf of All Others Similarly Situated,

        Plaintiff-Appellant,

v

LAKE SUPERIOR STATE UNIVERSITY and LAKE SUPERIOR STATE UNIVERSITY BOARD OF TRUSTEES,

        Defendants-Appellees.

FOR PUBLICATION
February 10, 2022
9:20 a.m.

No.  355128
Court of Claims
LC No.  20-000070-MK

---

KEVIN HORRIGAN,

        Plaintiff-Appellant,

v

EASTERN MICHIGAN UNIVERSITY and EASTERN MICHIGAN UNIVERSITY BOARD OF TRUSTEES,

        Defendants-Appellees.

No.  355377
Court of Claims
LC No.  20-000075-MK

---

JAEL DALKE,

        Plaintiff-Appellant,

v

CENTRAL MICHIGAN UNIVERSITY and CENTRAL MICHIGAN UNIVERSITY BOARD OF TRUSTEES,

No.  357275
Court of Claims
LC No.  20-000068-MK

-1-

Before: SWARTZLE, P.J., and K. F. KELLY and REDFORD, JJ.

K. F. KELLY, J.

These consolidated cases[1] present the question whether Michigan's constitutionally-created institutions of higher education are liable to their students for reimbursements for tuition and room and board as a result of the COVID-19 pandemic. In each case, the plaintiffs below contend the defendant universities breached their agreements with their students by imposing upon them remote learning environments—termed "emergency remote teaching" ("ERT") by plaintiffs—as opposed to traditional in-person classroom instruction, which plaintiffs contend was inferior. The plaintiffs below also seek reimbursements from the defendant universities for the period of time in which they did not remain on campus during the COVID-19 pandemic. In each case, we conclude the trial court did not err in granting summary disposition in favor of the defendant universities because the plaintiffs below failed to demonstrate that the defendant universities breached any contractual agreement with them.[2]

In Docket No. 357275, plaintiff Jael Dalke ("Dalke") appeals by right the trial court's opinion and order granting summary disposition under MCR 2.116(C)(10) in favor of defendants Central Michigan University and Central Michigan University Board of Trustees ("Central defendants"). In Docket No. 355128, plaintiff Katelyn Zwiker ("Zwiker"), individually and on behalf of all others similarly situated, appeals by right the trial court's opinion and order granting summary disposition under MCR 2.116(C)(8) and MCR 2.116(C)(10) in favor of defendants Lake Superior State University and Lake Superior State University Board of Trustees ("LSS defendants"). And, in Docket No. 355377, plaintiff Kevin Horrigan ("Horrigan") appeals by right the trial court's opinion and order granting summary disposition under MCR 2.116(C)(8) in favor of defendants Eastern Michigan University and Eastern Michigan University Board of Trustees ("Eastern defendants").

Finding no errors warranting reversal, we affirm.

## I. THE CONTRACTS

### A. CENTRAL MICHIGAN UNIVERSITY

---

[1] These cases were consolidated on the Court's own motion to "advance the efficient administration of the appellate process." *Dalke v Central Michigan Univ*, unpublished order of the Court of Appeals, entered December 14, 2021 (Docket Nos. 357275, 355128, 355377).

[2] This Court recognizes the very difficult situation the COVID-19 pandemic presented for Michigan's students, families, faculty, and administrators. The result from our opinion today in no way diminishes these very difficult challenges faced by all during these uncertain times.

Dalke registered for classes at Central Michigan University on December 27, 2019. Concurrent with her registration, Dalke was charged $6,255 for "Tuition and/or Fees" and was also charged a "Student Services Fee" of $255. The Financial Terms and Conditions associated with her registration stated that "[b]y completing registration at Central Michigan University for this semester, you agree to financial responsibility for all charges, including tuition and fees on your student account."

Dalke also signed a document providing that, in exchange for living in the on-campus residence hall, she agreed to the terms in defendant's housing contract. Under the housing contract, defendants agreed to provide Dalke with the use of residence facilities and food services. The contract stated that "times set for performance of this contract are subject to change because of . . . circumstances beyond the university's control that may affect the health or safety of students or affect the educational function of the institution." The housing contract did not terminate if a student moved to a private home, and a student who broke the contract without prior approval would remain liable for room and board. The contract, however, gave defendants the discretion to refund room and board. Dalke was charged for housing and an unlimited meal plan.

## B. LAKE SUPERIOR STATE UNIVERSITY

The LSS defendants' rates for the Spring 2020 semester provided for a $6,000 flat "One Rate" fee for students taking 12 to 17 credits. The fees included, among other things, an athletic fee for access to all regular-season athletic events, program fees related to "laboratory courses and equipment," student activity fees for student government and student activities, and special course fees to offset the costs of supplies, equipment, maintenance, and transportation for specified courses. The LSS defendants allowed students to select from online, regional, or traditional in-person instructional methods.

Zwiker agreed to the LSS defendants' financial responsibility agreement, which stated that Zwiker "understand[s] that when I register for any class at Lake Superior State University, or receive any service from Lake Superior State University, I accept full responsibility to pay all tuition, fees and other associated costs assessed at any time as a result of my registration and/or receipt of services, notwithstanding any anticipated third-party resource. .. ." The agreement also stated that it "supersedes all prior understandings, representations, negotiations and correspondence between the student and Lake Superior State University, constitutes the entire agreement between the parties with respect to the matters described, and shall not be modified" subject to exceptions.

Zwiker also signed a residence hall and dining services contract. In doing so, she "agree[d] to abide by all provisions of this contract as well as any rules, regulations, and procedures governing University Housing as may be published and amended from time to time by the University. .. ." The LSS defendants agreed to provide students in residences with "living space, facilities, furnishings, and meals (as applicable) in accordance with this contract and University policies." In exchange, Zwiker agreed to pay "a housing fee in accordance with the terms of this contract." The contract separately stated that any unused meals would not transfer from week to week, and no refunds would be issued for unused meals. Moving to private housing did not terminate Zwiker's financial obligations. Specifically, the housing resident handbook stated that students were required to complete check-out procedures before leaving the residence halls. To

move out before the end of the academic year, a student was required to "[f]ill out Intent to Leave Form in the Campus Life and Housing Office" and required to remove all personal belongings out of the room.

The agreement was subject to change for, among other reasons, "disorders which may affect the health or safety of students or affect the educational function of the institution." The parties also agreed that, "[i]n the event that the University shall be prevented from completing performance of any obligations hereunder by act of God or other occurrences whatsoever which are beyond the control of the parties hereto, then the University shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed by law."

## C. EASTERN MICHIGAN UNIVERSITY

Horrigan signed a financial responsibility statement in November 2019, which stated, in relevant part:

> I understand that when I register for any class at Eastern Michigan University (EMU) or receive any service from Eastern Michigan University I accept full responsibility to pay all tuition, fees and other associated costs assessed as a result of my registration and/or receipt of services.

Horrigan also agreed to defendants' housing contract, which provided that it would not terminate if the resident moved off campus. The housing contract also stated that if a resident chose to move out of the housing without a release, the resident would remain financially responsible. The Eastern defendants "reserve[d] the right to reassign or remove a resident from university housing for reasons of health, safety, welfare, failure to remain actively enrolled, or if the student poses a significant disruption to the on-campus housing community." The housing contract also stated that "[r]efunds are not given for missed or unused meals."

## II. COVID-19 PANDEMIC

On March 10, 2020, Governor Whitmer declared a statewide state of emergency related to the COVID-19 pandemic. Executive Order No. 2020-04, which has since been rescinded, stated, in relevant part:

> 1. A state of emergency is declared across the State of Michigan.
>
> 2. The Emergency Management and Homeland Security Division of the Department of State Police must coordinate and maximize all state efforts that may be activated to state service to assist local governments and officials and may call upon all state departments to utilize available resources to assist.
>
> 3. The state of emergency is terminated when emergency conditions no longer exist and appropriate programs have been implemented to recover from any effects of the emergency conditions, consistent with the legal authorities upon which this declaration is based and any limits on duration imposed by those authorities.

Subsequently, on March 20, 2020, Governor Whitmer issued an executive order requiring "all individuals currently living within the State of Michigan . . . to stay at home or at their place of residence," subject to exceptions to sustain or protect life. Executive Order No. 2020-21. The order was necessary "[t]o suppress the spread of COVID-19, to prevent the state's health care system from being overwhelmed, to allow time for the production of critical test kits, ventilators, and personal protective equipment, and to avoid needless deaths." *Id*.

## A. CENTRAL MICHIGAN UNIVERSITY

On March 11, 2020, Central Michigan University president, Bob Davies, stated classes would be moved to an online environment, and "students should not return to campus following spring break." The Central defendants' residence halls were closed to everyone but international students and student athletes, and limited food service was provided.

The Central defendants subsequently extended online-only classes until April 6, 2020. Residence halls were open for residents who needed housing, but the Central defendants "continue[d] to recommend that students with permanent residences off campus remain there at this time." On March 19, 2020, the Central defendants e-mailed students, stating that students with a housing contract could remain on campus until May 9, 2020, but students who chose to move out would receive a credit.

On March 23, 2020, Davies stated that, in response to the Governor's stay-home order, residence halls and apartments would remain open for students; however, he stated that students who were currently residing off campus should not return. On March 30, 2020, defendants stated they "continue[d] to recommend that all students return to their permanent residence if possible." However, housing and dining services remained open for students who continued to reside on campus. The deadline to withdraw from classes or choose to use a credit/no credit option for grades was extended until the end of May 2020.

## B. LAKE SUPERIOR STATE UNIVERSITY

In response to Governor Whitmer's March 10, 2020 emergency declaration, the LSS defendants suspended face-to-face instruction and moved classes to a virtual format. In a March 11, 2020 e-mail, the LSS defendants notified students that residence halls and dining services would remain open. They also notified students that its Campus Life Office would communicate with students about virtual organizations and events.

On March 20, 2020, Lake Superior State University president, Rod Hanley, stated that faculty members had successfully transitioned to virtual teaching and that students would be permitted to drop classes through the end of the semester, and emphasized that residence halls and dining services remained open. On April 7, 2020, the LSS defendants reiterated in an e-mail that residence halls and dining services remained open, but stated that, to maintain safety for students still living on campus, they were deactivating swipe-card access to residence halls for those students who were not then living on campus. The e-mail stated that the card's deactivation was reversible on request or in response to an appointment to remove belongings. And on April 8, 2020, Hanley requested that students planning to travel during the Easter holiday "abandon[]" such

plans and "stay in place." However, if a student insisted on leaving, he requested that they not return to campus.

## C. EASTERN MICHIGAN UNIVERSITY

On March 11, 2020, Donald Loppnow, Eastern Michigan University's president, stated by e-mail that face-to-face instruction was suspended and classes would be moved to a virtual, online format. Residence halls and dining facilities would remain open, but Loppnow encouraged students to return to their permanent places of residence "due to public health recommendations for social distancing." After Governor Whitmer issued the executive order requiring all individuals to stay at home or in their place of residence, the Eastern defendants closed their residence halls on March 31, 2020, and announced that housing and meal plan credits would be issued effective March 31, 2020.

## III. PROCEDURAL HISTORY

In each of the consolidated cases, Dalke, Zwiker, and Horrigan (collectively, "University plaintiffs") asserted causes of action based on breach of contract and unjust enrichment against the Central defendants, LSS defendants, and Eastern defendants (collectively, "University defendants"). The University plaintiffs each alleged they did not receive the full benefit of the tuition they paid before the pandemic began as a result of the transition to online learning environment, which they claim is of lesser value than in-person instruction. In each case, the University plaintiffs alleged the University defendants breached the parties' contracts, which provided that students would pay tuition in exchange for live, in-person instruction. As a result of the transition to online instruction in the Spring 2020 semester classes, the University plaintiffs seek a reduction or refund in tuition.

The University plaintiffs also alleged they did not receive reimbursements for their unused portions of room and board during the time they were in off-campus housing. According to the University plaintiffs, the University defendants breached their housing contracts by not housing the University plaintiffs for the entire semester or otherwise offering a refund for unused room and board. Lastly, the University plaintiffs each alleged that the University defendants failed to reimburse them for unused portions of student and other fees paid for services that were not provided. In addition to the breach of contract claims, the University plaintiffs alleged that the University defendants were unjustly enriched by retaining the tuition, room and board, and fees described.

## A. CENTRAL MICHIGAN UNIVERSITY

The Central defendants initially moved for summary disposition under MCR 2.116(C)(8). They asserted a constitutional right to control the university's affairs and claimed their academic decisions were not subject to judicial review. Alternatively, the Central defendants argued the trial court should dismiss Dalke's claim for breach of the tuition contract because she failed to identify a contractual provision under which defendants promised to provide the live, in-person instruction that formed the basis of her claim. Similarly, Dalke had not sufficiently identified which fees she had paid or what services defendants had agreed to provide. Moreover, Dalke could not establish damages because she could not establish the value of the educational instruction she received.

With respect to the claim regarding room and board, the Central defendants claimed Dalke failed to state a claim for breach of contract because she had not identified any terms or conditions of the parties' contract that had been breached. Additionally, Dalke voluntarily moved out of her residence hall and accepted a refund in lieu of remaining in university housing. Finally, the Central defendants argued that Dalke failed to state claims for unjust enrichment because her housing-related claim concerned the same subject matter as her room and board contract, and she could not establish that defendants obtained a windfall by retaining the fees it had been paid.

The trial court granted the Central defendants' motion in part and denied it in part. The trial court rejected the argument that the Michigan Constitution and federal caselaw prevented Dalke from asserting claims for breach of contract and unjust enrichment. However, concerning her breach of contract claims related to tuition, the trial court previously ordered Dalke to provide all documents supporting her tuition-based claim for breach of contract. In response, she produced marketing information and excerpts from the Central Michigan University registration portal and course catalog. According to the trial court, none of the documents promised that, if Dalke paid tuition, the Central defendants "would exclusively provide in-person instruction." The trial court also noted that Dalke failed to establish a breach or damages because the Central defendants provided instruction, she completed her courses, and she received credit toward her graduation requirements. Because she had not established the required elements of breach of contract, the trial court granted summary disposition under MCR 2.116(C)(10) in favor of the Central defendants on the breach-of-contract claim but denied summary disposition with respect to unjust enrichment.

Addressing Dalke's breach-of-contract claim based on room and board, the trial court determined that she established that a housing contract existed. However, she had not established that the Central defendants breached the contract because it provided that the times of performance were subject to change on the basis of "*circumstances beyond the university's control that may affect the health or safety of students . . . .*" The trial court reasoned that the COVID-19 pandemic was a circumstance beyond the Central defendants' control that allowed the contract to be altered. Additionally, while the Central defendants encouraged students to move out, the halls and dining rooms remained open to students who could not. Thus, the trial court granted summary disposition under MCR 2.116(C)(10) in favor of the Central defendants with respect to this breach-of-contract claim. The trial court also granted summary disposition under MCR 2.116(C)(8) in favor of the Central defendants with respect to Dalke's unjust-enrichment claim because an express written contract precluded the claim.

With respect to Dalke's fee claim, the trial court granted summary disposition in favor of the Central defendants, finding that she did not attach an alleged contract to the complaint, and that she failed to identify the amount of fees each student paid, what services they were to receive in return, or what services she did not receive for the second half of the semester. Dalke's account statement was not a contract because it provided no promises in exchange for the fees. However, the trial court concluded that she had sufficiently pleaded an unjust-enrichment claim related to fees to survive summary disposition.

The Central defendants subsequently moved for partial summary disposition under MCR 2.116(C)(10) regarding plaintiff's unjust-enrichment claim related to tuition, explaining they did not charge more for online classes than for in-person classes, and Dalke could not establish that

they received a windfall from retaining plaintiff's tuition. Dalke responded that emergency remote teaching, which she characterizes as the "[t]he rapid transfer of some portion of a course to the online environment to ensure continuity of instruction during unpredictable emergent situations that threaten the ability to teach on-campus," was not equivalent to regular online classes because the value of online classes was higher. According to Dalke, this was the case because the Central defendants had ample time to prepare traditional online course materials, in contrast with the short amount of time in reaction to the pandemic. In support of her arguments, Dalke relied on a report prepared by Ted Tatos, an economist and statistician, who opined that emergency remote teaching was different from standard online learning, "which requires substantial preparation and involves courses designed for online delivery." Tatos concluded that emergency remote teaching was not the equivalent of online instruction and opined that students did not receive the same educational benefit from emergency remote teaching as they would have from in-person instruction or regular online education.[3]

The trial court granted the Central defendants' motion for partial summary disposition under MCR 2.116(C)(10). It found that the documentary evidence supported the claim they did not receive a windfall as a result of the transition to remote learning. The Central defendants charged the same for in-person and online credit hours, and the parties did not dispute that students who successfully completed courses were awarded the same credit toward graduation as they would have without the pandemic.

In March 2021, the Central defendants moved for summary disposition under MCR 2.116(C)(10) on Dalke's contractual and unjust-enrichment claims for her fees. The Central defendants argued that the credit Dalke received to her student account and the money she received under the Coronavirus Economic Stabilization ("CARES") Act, 15 USC 9001 *et seq.*, compensated her for the amount of fees she had paid during the Spring 2020 semester. Additionally, with respect to parking fees, Dalke's parking permit remained active, and she was allowed to park on campus the entire time. Regarding the student services fee, the Central defendants argued that the fee did not fund any particular service. It funded a variety of functions, such as academic advising, counseling, and student success coaching, which defendants provided for the entire semester.

Dalke responded that a genuine issue of material fact existed regarding whether the Central defendants continued to provide services related to the parking fee by citing her complaint, in which she alleged that the Central defendants had not continued providing a parking service. She

---

[3] Although relied on below by Dalke, neither Zwiker nor Horrigan relied on or otherwise presented Tatos's findings to the trial court. Nevertheless, in their briefs to this Court, Zwiker and Horrigan have presented Tatos's findings as support for reversal of the trial court's decisions. On motion by the LSS defendants, this Court struck Tatos's declaration and any arguments discussing it. *Zwiker v Lake Superior State Univ*, unpublished order of the Court of Appeals, entered April 5, 2021 (Docket No. 355128). Additionally, because the declaration was not presented to the trial court by Horrigan, we decline to consider it in connection with his as well. See *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 165; 761 NW2d 784 (2008) ("This Court's review is limited to the record of the trial court."). Moreover, and regardless of whether the declaration was properly preserved, we find Tatos's findings unpersuasive in the context of these cases.

also argued that "the Student Services Fee was paid with the understanding that benefits would occur on-campus," but the Central defendants had canceled all on-campus events. Dalke also moved for leave to amend her complaint.

The trial court ultimately granted the Central defendants' motion for summary disposition under MCR 2.116(C)(10). Dalke failed to respond to the motion with evidence and had instead cited her complaint, which was not a sufficient response. The trial court also determined that Dalke's proposed amended complaint would be futile.

## B. LAKE SUPERIOR STATE UNIVERSITY

The LSS defendants moved for summary disposition under MCR 2.116(C)(8) and (10). The LSS defendants argued that they had a constitutional right to craft their response to the COVID-19 pandemic. They also argued that they did not breach the tuition contract because it did not guarantee live, in-person instruction. Concerning Zwiker's housing contract, the LSS defendants claimed the contract's force-majeure clause excused them from further performance because of circumstances beyond their control. Moreover, Zwiker was provided housing for the entire semester because students were free to remain on campus. According to the LSS defendants, the contract provided that moving to private housing did not terminate residency and that students were not eligible for prorated room and board if the student did not complete the check-out process, which Zwiker had not done. The housing contract also stated that there was no refund for unused meals. Finally, the LSS defendants argued that Zwiker's unjust-enrichment claims failed as a matter of law because the contracts expressly covered the subject matter of the claims.

Zwiker responded that she had established damages that were not speculative because she did not receive the benefit of the live, in-person instruction she had paid for, and she would be able to quantify her damages during discovery. She additionally argued that the LSS defendants' claim that fee-related services had been provided was a factual claim, and that students were not able to make substantial use of the services. With respect to the force-majeure clause, Zwiker argued that the clause applied equally to students and, because Zwiker's performance was impossible, she was excused from performing under the contract. She claimed her decision to leave campus was not voluntary as a result of the LSS defendants' strongly worded letters to students and deactivation of card access to the residence halls.

The trial court granted the LSS defendants' motion for summary disposition under MCR 2.116(C)(8) and (10), finding first that the tuition contract did not guarantee live, in-person learning. According to the trial court, the unambiguous terms of the tuition contract rendered Zwiker liable for paying tuition after she registered for classes and received instruction services. The trial court concluded that Zwiker had not established that she had specifically selected traditional campus instructional methods or that the class catalog was incorporated into the contract.

The trial court also determined that the LSS defendants were entitled to summary disposition on Zwiker's claim for breach of contract related to fees because the tuition contract assessed fees as the result of registration, not as the result of receiving services, and the contract did not provide that a refund would be issued if the services were not utilized. The trial court held that the LSS defendants established through documentary evidence that students were permitted

to remain in student housing and receive meal services, and Zwiker did not establish that the LSS defendants failed to provide housing and meals for the entire semester. While students were encouraged to leave or not to return if they had already left, the LSS defendants did not prevent students from returning or fail to make housing and meals available. Additionally, the housing contract provided that a student's move to a private home or other housing did not terminate the residency or financial conditions of the housing contract and explicitly provided that there was no refund for unused meals.

Lastly, the trial court dismissed Zwiker's unjust-enrichment claims under MCR 2.116(C)(8). The trial court reasoned that the existence of the tuition and housing contracts prevented her from proceeding on an unjust-enrichment theory.

## C. EASTERN MICHIGAN UNIVERSITY

The Eastern defendants moved for summary disposition under MCR 2.116(C)(8). The Eastern defendants argued that they had a constitutional right to craft their response to COVID-19 because responding to the pandemic by moving instruction to an online format constituted an academic judgment. They also argued, similar to the other defendants, that they did not breach the tuition contract because it did not guarantee live, in-person instruction. Under the Eastern defendants' agreement, Horrigan was required to pay all tuition, fees, and other associated costs that occurred as a result of his registration, and his expectations did not alter the contract's language.

With respect to the housing contract, the Eastern defendants argued that the contractual language explicitly contemplated that students might be asked to leave before the end of the term and stated that the relationship was subject to change on the basis of conditions that affected the health or safety of students. The contract also provided no refund for unused meals. Finally, the Eastern defendants argued Horrigan's unjust-enrichment claims failed as a matter of law because the tuition and housing contracts expressly covered the subject matter of the claims.

Horrigan responded that the Eastern defendants' arguments concerning breach of the tuition contract were meritless because they had not demonstrated that any contractual language applied to the parties' dispute. Horrigan also argued that, if the Eastern defendants were entitled to terminate the housing contract for public health reasons, he was entitled to a refund. Horrigan clarified that the fees the Eastern defendants failed to provide services for were a general fee, a technology fee, and a student center fee. When the Eastern defendants closed the majority of campus buildings, Horrigan was unable to use the services with which the fees were associated. Finally, Horrigan argued that he was entitled to argue unjust enrichment in the alternative because the contract was ambiguous regarding mode of instruction. He denied that the Eastern defendants benefited students after retaining the funds because course credits were not the only benefit of university enrollment.

The trial court granted the Eastern defendants' motion for summary disposition under MCR 2.116(C)(8), concluding that the plain language of the contracts precluded Horrigan's claims. The trial court concluded that under the tuition contract, Horrigan accepted responsibility to pay for all services and pay fees as a result of registering or receiving services. The contract did not contain

any language about the mode of instruction. Because the contract was not ambiguous and did not promise live instruction, it did not require that Horrigan receive a specific mode of instruction.

The trial court also held that the Eastern defendants' housing contract expressly reserved the right to remove students from university housing for health and safety reasons and provided that refunds would not be given for missed or unused meals. The language was not ambiguous and did not contain qualifications. Accordingly, Horrigan was not entitled to a refund for meals or housing. With respect to fees, the trial court explained that the tuition agreement governed both tuition and fees, and Horrigan had agreed to pay all fees that resulted from registering or receiving services. Horrigan admitted that he registered for classes; therefore, he had agreed to pay the fees. As in the other cases, the trial court also concluded Horrigan's claims for unjust enrichment failed because there were express agreements between the parties covering the same subject matter.

These appeals followed.

## IV. ANALYSIS

### A. STANDARDS OF REVIEW

In the proceedings below, the trial courts granted defendants motions for summary disposition under MCR 2.116(C)(8) and MCR 2.116(C)(10). "We review de novo a decision by the Court of Claims on a motion for summary disposition . . . ." *Brunswick Bowling & Billiards Corp v Dep't of Treasury*, 267 Mich App 682, 684; 706 NW2d 30 (2005).

"A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint." *Dell v Citizens Ins Co of America*, 312 Mich App 734, 739; 880 NW2d 280 (2015). We accept all well-pleaded factual allegations as true and we construe them in the light most favorable to the nonmoving party. *Id*. "Conclusory statements, unsupported by factual allegations, are insufficient to state a cause of action." *Churella v Pioneer State Mut Ins Co*, 258 Mich App 260, 272; 671 NW2d 125 (2003). "A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Dell*, 312 Mich App at 739.

When reviewing a decision under MCR 2.116(C)(10), this Court considers the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party. *Sallie v Fifth Third Bank*, 297 Mich App 115, 117-118; 824 NW2d 238 (2012). Summary disposition is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10); *Latham v Barton Malow Co*, 480 Mich. 105, 111; 746 NW2d 868 (2008).

We also review de novo the proper interpretation of a contractual provision. *Reed v Reed*, 265 Mich App 131, 141; 693 NW2d 825 (2005). "Whether a contract is ambiguous is a question of law, while determining the meaning of ambiguous contract language becomes a question of fact." *Bodnar v St John Providence, Inc*, 327 Mich App 203, 220; 933 NW2d 363 (2019).

A decision by the trial court to deny a motion to amend a pleading is reviewed for an abuse of discretion. *Aguirre v Michigan*, 315 Mich App 706, 713; 891 NW2d 516 (2016). "The determination that a trial court abused its discretion involves far more than a difference in judicial

opinion." *In re Kostin*, 278 Mich App 47, 51; 748 NW2d 583 (2008). "Rather, an abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *Id*.

## B. TUITION, FEES, AND IN-PERSON INSTRUCTION

Zwiker and Horrigan argue that the term "services" in their respective tuition contracts are ambiguous and, therefore, the trial court erred because there are genuine issues of material fact and parol evidence is necessary to determine the parties' intent.[4] In each case, the tuition contracts from Lake Superior State University and Eastern University stated that students "accept full responsibility to pay all tuition, fees and other associated costs assessed at any time as a result of [student's] registration and/or receipt of services."

This Court will enforce unambiguous contracts as written. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). It is not this Court's role to undermine the parties' freedom to contract by rewriting clear contractual language to comply with what the Court perceives as the parties' intent. *Id*. at 468-469. Rather, this Court construes contractual terms in context, according to their commonly used meanings. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). A contract is ambiguous when its provisions are capable of conflicting interpretations. *Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 566; 596 NW2d 915 (1999). A contract is not ambiguous solely because the parties may interpret a term differently. *Id*. at 567. Failure to define a word does not make a contract ambiguous. *Henderson*, 460 Mich at 354.

With respect to the tuition contracts from Eastern Michigan University and Lake Superior State University, the trial court determined the tuition contracts provided that, by registering for a class, the student agreed to pay all tuition, fees, and associated costs. The trial court held that the unambiguous terms of the tuition contracts rendered Zwiker and Horrigan liable for paying tuition after registering for classes and receiving instruction services. Additionally, the tuition contracts assessed fees as the result of registration, not as the result of receiving services.

Both tuition contracts state that financial responsibility is incurred at registration or receipt of service. The word "or" is a disjunctive term used to express a choice between alternatives. *Campbell v Dep't of Treasury*, 331 Mich App 312, 320; 952 NW2d 568 (2020). We find no error in the trial court's conclusion that unambiguous terms of the tuition contract rendered students liable for paying tuition once they registered for classes. Thus, whether or not the term "services" is ambiguous is irrelevant because students' financial responsibility began upon registration.

---

[4] Plaintiffs failed to preserve the argument that parol evidence was necessary by failing to raise it first in response to defendants' dispositive motions. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). Nevertheless, we exercise our inherent power to address unpreserved issues where, as here, the issue is a legal one for which all facts have been presented and resolution is required to properly decide the case. See *Autodie, LLC v Grand Rapids*, 305 Mich App 423, 431; 852 NW2d 650 (2014).

Zwiker and Horrigan also argue that the trial court erred because it should have considered parol evidence to determine the meaning of the contract because it was obviously incomplete when the services to be provided were not defined within the contract. "[P]arol evidence of contract negotiations or of prior or contemporaneous agreements that would contradict or vary the terms of a written contract are not admissible to vary a contract that is clear and unambiguous." *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 492; 579 NW2d 411 (1998) (quotation marks and citation omitted). If the contract contains an integration clause, parol evidence is only admissible (1) to prove that the clause was fraudulent, (2) to invalidate the entire contract, or (3) if the contract is obviously incomplete on its face. *Id*. at 494-495. When a contract contains an express integration or merger clause, it is conclusive evidence that the agreement is the entire agreement, and parol evidence is not admissible. *Hamade v Sunoco Inc (R & M)*, 271 Mich App 145, 169; 721 NW2d 233 (2006).

With respect to both Eastern Michigan University and Lake Superior State University, the tuition contracts contained merger and integration clauses stating that contract constituted the entire agreement between the parties. Zwiker and Horrigan do not claim the contracts were fraudulent or do not otherwise seek to invalidate the tuition contracts. Thus, whether parol evidence is proper in the face of the merger and integration clauses depends upon whether the tuition contracts are obviously incomplete. We reject the suggestion that they are. Zwiker and Horrigan agreed to pay "all tuition, fees and other associated costs assessed as a result of my registration and/or receipt of services . . . ." There is no missing term and the agreement is not incomplete. That the term "services" is undefined does not render the contracts incomplete. *Terrien v Zwit*, 467 Mich 56, 76; 648 NW2d 602 (2002) ("[T]he fact that a contract does not define a relevant term does not render the contract ambiguous.").

In all cases consolidated on appeal, The University plaintiffs claim the University defendants breached their agreements by failing to provide live, in-person instruction. The University plaintiffs, however, have pointed to no contractual language in which the University defendants promised such method of instruction. The University plaintiffs have the burden to show that a contract exists in order for the contract to be enforced, because "the court cannot make a contract for the parties when none exists." *Kamalnath v Mercy Mem Hosp Corp*, 194 Mich App 543, 549; 487 NW2d 499 (1992) (quotation marks and citations omitted). "A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014).

To the extent the University plaintiffs claim the trial court erred because it failed to recognize their noncontractual expectation to live, in-person instruction, such a claim fails as a matter of law. A party's expectations do not supersede the language of an unambiguous contract. See *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 60; 664 NW2d 776 (2003) (rejecting rule of reasonable expectation related to insurance contracts). "[A] contract requires mutual assent or a meeting of the minds on all the essential terms." *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 453; 733 NW2d 766 (2006). A court considers the parties' express words and visible acts, and not the parties' subjective states of mind, to determine whether there was mutual assent to a contract. *Id*. at 454. "Where mutual assent does not exist, a contract does not exist." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 372-373; 666 NW2d 251 (2003).

Moreover, in none of the cases below did the University plaintiffs provide the trial court with any contractual language in which the University defendants promised live, in-person instruction. Most pertinently, with respect to the Central defendants, the trial court granted their motion for summary disposition because, in response to the trial court's order that Dalke produce the contractual language upon which she based her claim, Dalke provided screenshots and excerpts from the Central defendants' registration portal and course catalog, as well as marketing information. None of the documents promised that if Dalke paid tuition, the Central defendants "would exclusively provide in-person instruction."

Relatedly, Zwiker and Horrigan claim the trial court below granted summary disposition prematurely and further discovery is needed in order to determine the meaning of the contract. Summary disposition is premature before discovery is complete when further discovery "stands a fair chance of uncovering factual support for the opposing party's position." *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 292; 769 NW2d 234 (2009). As already discussed above, however, we find no error in the trial courts' conclusions below that the financial agreements between the parties were unambiguous and did not promise live, in-person instruction. Thus, further factual development in discovery does not stand a fair chance of uncovering additional support for Zwiker and Horrigan's arguments.

Lastly, Horrigan contends that the tuition contract between him and the Eastern defendants violates public policy because it provides for false advertising. Contracts that "tend to be injurious to the public or against the public good. .. are illegal and void[.]" *Mahoney v Lincoln Brick Co*, 304 Mich 694, 706; 8 NW2d 883 (1943). We reject the notion that the Eastern defendants' tuition contract violates public policy. The Eastern defendants are part of a constitutionally-created university and accredited institution of higher education that, like every other individual and business, had to adapt in the face of a global pandemic. Despite the challenges, the Eastern defendants successfully offered their students instruction in a manner that was safe to the students, faculty, and staff. The fact that Horrigan perceives the contract, in hind sight, to be unfair, does not render the contract as against public policy. See *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 372-373; 817 NW2d 504 (2012). Horrigan paid for tuition and received the corresponding credits. There is nothing so injurious to the public about this arrangement to cause the Court to afford relief under this theory.

## C. ROOM AND BOARD

In their appeals to this Court, the University plaintiffs contend the trial court erred when it granted summary disposition in favor of the University defendants with respect to their claims for breach of contract for room and board because the purpose of the contract was frustrated by the COVID-19 pandemic. The University plaintiffs claim the pandemic was not reasonably foreseeable and prevented the parties from fulfilling their obligations under the housing contracts. The University plaintiffs failed to raise this issue in the trial court below and have, therefore, failed to preserve it for appeal. *Peterman*, 446 Mich at 183. Nevertheless, as with the argument concerning parol evidence, we will review the issue because it presents a question of law and a resolution is required to properly decide the case. *Autodie*, 305 Mich App at 431.

A contractual frustration of purpose exists when "a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the

contract," despite the fact that nothing impedes the party from performing the contract. *Liggett Restaurant Group, Inc v Pontiac*, 260 Mich App 127, 133-134; 676 NW2d 633 (2003) (quotation marks and citation omitted). For a frustration of purpose to exist:

> (1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; [and] (3) this purpose must have been basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been due to the fault of the frustrated party and the risk of which was not assumed by him. [*Id*. at 134-135.]

With respect to Eastern Michigan University, in the parties' housing contract, the Eastern defendants "reserve[d] the right to reassign or remove a resident from university housing for reasons of health, safety, welfare, failure to remain actively enrolled, or if the student poses a significant disruption to the on-campus housing community." The housing contract also stated that "[r]efunds are not given for missed or unused meals." Likewise, with respect to Central Michigan University, the housing contract specifically stated that "times set for performance of this contract are subject to change because of. .. circumstances beyond the university's control that may affect the health or safety of students or affect the educational function of the institution." And, with respect to Lake Superior State University, the contract did contain a force-majeure clause, in which the parties agreed defendants' performance would be excused for "act of nature" or an "act of God" beyond the control of the parties.

In other words, these contracts expressly contemplated circumstances under which it is necessary to remove students from housing for reasons of health, safety, and welfare. Horrigan cannot establish the parties failed to contemplate an outbreak of illness that might discontinue access to food and housing. Nor can he establish that the possibility that he might be removed from university housing and miss meals because of a pandemic was not reasonably foreseeable when the parties' contract expressly provided that students might be removed from housing for health and safety reasons.

Zwiker also contends the trial court erred when it granted summary disposition in favor of the LSS defendants because they breached the housing agreement by preventing her from returning to her residence. Aside from the allegation, however, Zwiker provides no documentary proof and, for their part, the LSS defendants submitted documentary evidence showing that while they encouraged students to shelter in place if off campus, the residence halls remained open. And while the LSS defendants did deactivate the card access for students who were not actively on campus, the deactivation could be reversed by request. In short, Zwiker failed to show that the LSS defendants breached the housing contract by preventing her from participating in it.

## E.  UNJUST ENRICHMENT

Unjust enrichment is an equitable theory that allows the trial court to imply a contract in order to prevent the unjust enrichment of a party. *Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 478; 666 NW2d 271 (2003). To show that a benefit would unjustly enrich the defendant, the plaintiff must establish that the defendant received a benefit from the plaintiff, and that it would be inequitable for the defendant to keep the benefit. *Id*. "No person is unjustly enriched unless

the retention of the benefit would be unjust." *Tkachik v Mandeville*, 487 Mich 38, 48; 790 NW2d 260 (2010) (quotation marks and citation omitted). Courts may not imply a contract under an unjust-enrichment theory if there is an express agreement covering the same subject matter. *Belle Isle Grill Corp*, 256 Mich App at 478.

In each case below, the University plaintiffs argue the trial court erred when it granted summary disposition with respect to their unjust-enrichment claims because no express contract governed the same subject matter as the claims for tuition and room and board. We disagree. The University defendants' housing contracts addressed the possibility of circumstances affecting the health and welfare of students. Similarly, the University defendants' tuition contracts specifically addressed student payment obligations when registering for courses. The parties agreed to these terms. Thus, the express agreements between the parties governed the same subject matter as their equitable claims regarding tuition and room and board. And while Dalke claims that summary disposition was premature and discovery was needed to develop her claims, we agree with the trial court that further discovery would not stand a fair chance to uncover support for her claims. See *Marilyn Froling Revocable Living Trust*, 283 Mich App at 292..

We also reject Dalke's argument that the trial court erred when it granted summary disposition with respect to parking and student service fees. The Central defendants established Dalke's parking permit was active from August 24, 2019 to August 21, 2020, and she was allowed to park on campus. The Central defendants also established that the programs that received support from the student services fee continued during the Spring 2020 semester. Dalke did not establish that disputed issues of fact existed. She did not identify any facts to support that she was unable to park on campus; instead, she cited her complaint, which is not permitted under MCR 2.116(G)(4). Dalke also argued that retention of the student services fee unjustly enriched the Central defendants because she paid the fee with the understanding that services would occur on campus. Again, Dalke merely relied on an unsupported allegation. Because Dalke did not properly contest this issue under MCR 2.116(G)(4), the trial court did not err by granting summary disposition.

## F. MOTION TO AMEND

Dalke argues that the trial court abused its discretion when it denied her motion to amend her complaint. A party may move the trial court for leave to amend a complaint, and "[l]eave shall be freely given when justice so requires." MCR 2.118(A)(2). If the trial court grants a party's motion for summary disposition under MCR 2.116(C)(8), (9), or (10), the trial court shall give the parties an opportunity to amend the pleadings "unless the evidence then before the court shows that amendment would not be justified." MCR 2.116(I)(5). The trial court need not give a party an opportunity to amend a pleading if the amendment would be futile. *Weymers v Khera*, 454 Mich 639, 659; 563 NW2d 647 (1997).

"An amendment is futile where, ignoring the substantive merits of the claim, it is legally insufficient on its face." *Hakari v Ski Brule, Inc*, 230 Mich App 352, 355; 584 NW2d 345 (1998) (quotation marks and citation omitted). A proposed amendment is also futile if summary disposition would be appropriately granted regarding the new claims, either when a party has not established a genuine issue of material fact regarding an element, *Ormsby v Capital Welding, Inc*, 471 Mich 59-60; 684 NW2d 320 (2004), or when the undisputed facts establish that summary

disposition would be appropriate, *Nowacki v State Employees' Retirement Sys*, 485 Mich 1037, 1037; 776 NW2d 911 (2010).

The trial court granted summary disposition on Dalke's allegations related to tuition and fees on the basis that none of the documents that she provided promised that if she paid tuition, the Central defendants "would exclusively provide in-person instruction." Regarding Dalke's claim for fees, the account statement that she provided was not a contract because it provided no promises in exchange for the fees. In Dalke's proposed amendment, she based her allegation on a "mutuality of obligation" because "the University was obligated to provide the traditional, live in-person courses" specified in her course schedule. Dalke asserted that intrinsic evidence was necessary to fill in the gaps of her fee statement.

The trial court properly denied Dalke's motion for leave to amend because her proposed amendment was based on documents that the trial court had already considered and with which Dalke had already attempted to support her position. The trial court determined that the documents did not promise live, in-person instruction. Dalke's proposed amendment regarding her fee-related claims are futile because she could not refute the Central defendants' documentary evidence regarding her express or implied contract claims. Thus, the trial court's decision to deny her motion for leave to amend did not fall outside the range of reasonable outcomes because the trial court would have granted summary disposition on the amended claims for the same reasons it originally granted summary disposition.

For similar reasons, we conclude the trial court did not abuse its discretion by concluding Dalke's proposed amendments to her room and board claims were futile. "[P]arol evidence of contract negotiations or of prior or contemporaneous agreements that would contradict or vary the terms of a written contract are not admissible to vary a contract that is clear and unambiguous." *UAW-GM Human Resource Ctr*, 228 Mich App at 492 (quotation marks and citation omitted). A contract is ambiguous when its provisions are capable of conflicting interpretations. *Nikkel*, 460 Mich at 566.

The trial court granted summary disposition in favor of the Central defendants because the trial court did not identify any terms or conditions of the parties' housing contract that the Central defendants had breached. The contract itself provided that there would be no refund for unused meals. Additionally, Dalke voluntarily moved out of her residence hall and accepted a refund in lieu of remaining in university housing. In arguing for leave to amend, Dalke stated that the housing contract was not fully integrated and required parol evidence to interpret. Specifically she argued that the contract did not specify the amounts that students would be charged for room and board, and it was necessary to consider the student's billing statement to determine the amounts due. Dalke asserted that an implied term of the contract was that the premises would be fit for the intended use by the parties.

The trial court did not abuse its discretion in determining that the proposed amended claims related to the room and board contract were futile because they went beyond the plain language of the contract. The decision did not fall outside the range of reasonable and principled outcomes because Dalke's proposed amendment offered parol evidence but did not establish that the contract was ambiguous such that parol evidence was necessary. Similarly, Dalke stated that an implied term of the contract was that the premises would be fit for their intended use, but she did not

establish a basis by which the trial court could consider evidence beyond the contractual language itself.

Lastly, the trial court did not abuse its discretion in denying Dalke's proposed claim regarding the CARES Act. In the context of her unjust-enrichment claim, Dalke's proposed amended complaint alleged that "[e]quity" required the Central defendants to refund a portion of the monies received for tuition, especially since they received "government funds under the CARES Act that could have been used for student refunds." Although the trial court did not specifically address the CARES Act by name, it denied Dalke's motion for leave to amend on the basis that her claims regarding unjust enrichment related to tuition were futile because Dalke could not base her claim on the level or quality of education. This claim was not materially different from the claim made in her original complaint. As discussed above, the trial court did not err when it granted summary disposition in favor of the Central defendants regarding Dalke's unjust-enrichment claim. Accordingly, the trial court did not abuse its discretion when it denied virtually the same claim in her proposed amended complaint.

Affirmed. As these cases present questions of public importance, no costs may be taxed by the University defendants. See MCR 7.219(A).

/s/ Kirsten Frank Kelly
/s/ James Robert Redford